**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**BRENDA LEA RATLIFF,**

                Plaintiff,

**v.**
                                 **CIVIL ACTION NO.: 2:15-CV-64**
                                 **(BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

                Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On August 21, 2015, Plaintiff Brenda Lea Ratliff ("Plaintiff"), through counsel

Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final

decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On November 2, 2015,

the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer,

ECF No. 6; Admin. R., ECF No. 7). On November 12, 2015, and December 17, 2015,

Plaintiff and the Commissioner filed their respective Motions for Summary Judgment

and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for

Summ. J. ("Def.'s Mot."), ECF No. 14). On December 23, 2015, Plaintiff filed a

Response to the Commissioner's brief. (Pl.'s Resp. to Def.'s Br. ("Pl.'s Resp."), ECF No.

16). The matter was referred to the undersigned United States Magistrate Judge for a

Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. PROCEDURAL HISTORY

On May 7, 2012, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability that began on October 1, 2009.[1] (R. 19, 218). Because Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through June 30, 2014, Plaintiff must establish disability on or before this date. (R. 19). Plaintiff's claim was initially denied on July 19, 2012, and denied again upon reconsideration on October 25, 2012. (R. 155, 164). After these denials, Plaintiff filed a written request for a hearing. (R. 167).

On January 28, 2014, a hearing was held before United States Administrative Law Judge ("ALJ") Regina Carpenter in Morgantown, West Virginia. (R. 54, 177). Plaintiff, represented by her counsel Mr. Bailey, appeared and testified. (R. 54). Larry Bell, an impartial vocational expert, also testified, via telephone. (R. 57, 176). On March 7, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she is not disabled within the meaning of the Social Security Act. (R. 16). On May 5, 2014, Plaintiff requested that the Appeals Council review the ALJ's decision and submitted additional records (R. 95-126) for the Appeals Council to consider. (R. 15). The Appeals Council reviewed the additional records but determined that they were not relevant because

---

[1] Plaintiff previously filed a Title II claim for disability and DIB on or about March 23, 2011, alleging disability that began on November 30, 2009. (R. 129, 211). Plaintiff reports that "at least a portion of [the] records from [her previous] application [are] housed within this present 2012 application." (Pl.'s Br. in Supp. of her Mot. for Summ. J. at 1, ECF No. 11).

they were dated after March 7, 2014, the date of the ALJ's decision. (R. 2). On June 30, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

### III. BACKGROUND

#### A. Personal History

Plaintiff was born on February 1, 1969, and was forty-three years old at the time she filed her claim for DIB. (See R. 128). Plaintiff is married but lives in a separate household from her spouse, although they both live on "[t]he same property." (R. 68, 70, 84). She is 5'4" tall and weighs approximately 183 pounds. (R. 242). She graduated from college and received a bachelor's degree in education, although she never received any other specialized, trade or vocational training. (R. 68, 242-43). Her prior work experience includes working as a teacher, home health aide, drier operator, fast food worker and sales clerk. (R. 261, 267). She alleges that she is unable to work due to the follow impairments: (1) fibromyalgia; (2) depression; (3) anxiety (4) arthritis; (5) a social disorder /inability to get along with others and (6) obesity. (R. 128, 242, 270).

#### B. Medical History

##### 1. Medical History Pre-Dating Alleged Onset Date of October 1, 2009

On or about May of 2008, Plaintiff presented to the Family Medical Clinic of Jane Lew ("Family Medical Clinic") in Lewis County, West Virginia, where Plaintiff received primary care treatment. (See R. 508). During this visit, Plaintiff complained of low back pain with radiculopathy. (Id.). An MRI of Plaintiff's lumbar spine was ordered, which revealed "[m]ild degenerative changes at the T12-L1 level with no disc herniation or stenosis." (Id.).

On December 22, 2008, Plaintiff returned to the Family Medical Clinic, complaining of moderate bilateral shoulder pain. (R. 353). While being examined, Plaintiff was noted to suffer from limited range of motion of her shoulders due to her pain. (Id.). After the examination, Plaintiff was diagnosed with osteoarthritis and prescribed naproxen for her pain. (R. 354).

On March 3, 2009, Plaintiff again returned to the Family Medical Clinic, complaining of long-standing mild pain in her right shoulder and anxiety. (R. 351). After an examination, Plaintiff was diagnosed with generalized anxiety disorder and right shoulder pain. (R. 352). Plaintiff was prescribed citalopram, an antidepressant, for her anxiety and continued on naproxen for pain. (Id.).

On August 17, 2009, Plaintiff presented to the Family Medical Clinic for a follow-up visit to refill her prescriptions. (R. 349). During this visit, Plaintiff complained of continuing anxiety. (Id.). Plaintiff was noted to have long-standing problems with anxiety, although her mood was documented as improved. (Id.). After an examination, Plaintiff's prescription of citalopram was increased. (R. 350).

## 2. Medical History Post-Dating Alleged Onset Date of October 1, 2009

Plaintiff presented to the Family Medical Clinic several times in May of 2010. On May 13, 2010, Plaintiff requested a refill of her naproxen prescription. (R. 347). After an examination, however, Plaintiff was noted to be experiencing some symptoms of gastroesophageal reflux disease ("GERD"). (Id.). Therefore, Plaintiff's naproxen prescription was changed to Mobic and Plaintiff was encouraged to start taking over-the-counter Zantac. (R. 348). Plaintiff was also encouraged to start taking over-the-counter fish oil supplements, a B-complex vitamin and vitamin D3. (Id.). Subsequently,

on May 18, 2010, Plaintiff complained of joint pain and stated that Mobic was "not helping" her pain. (R. 345). After an examination, Plaintiff was diagnosed osteoarthritis and GERD. (R. 346). While Plaintiff's GERD symptoms were noted to be "better some off naproxen," Plaintiff was told to stop taking Mobic, re-prescribed naproxen to manage her pain and prescribed Prilosec for her GERD symptoms. (R. 345-46).

On June 28, 2010, Plaintiff returned to the Family Medical Clinic, complaining of neck and right shoulder pain. (R. 343). During this visit, Plaintiff stated that she experienced sharp pain when turning her head. (Id.). After an examination, X-rays of Plaintiff's cervical spine were ordered, which revealed no abnormalities. (R. 334). Therefore, Plaintiff was diagnosed with neck pain and offered a referral for physical therapy, which she refused. (R. 344). Plaintiff was then prescribed Skelaxin, a muscle relaxant. (Id.).

On October 25, 2010, Plaintiff presented to the Family Medical Clinic, requesting medical authorization to donate blood plasma. (R. 330). Specifically, Plaintiff stated that she had been diagnosed with a heart murmur as a child and was instructed by a plasma donation center "to have it checked before she donates again." (Id.). After an examination, Plaintiff's heart rate and rhythm were noted to be regular with no murmurs and Plaintiff was informed that she could safely donate blood plasma. (R. 330-31).

On March 22, 2011, Plaintiff returned to the Family Medical Clinic for a follow-up appointment regarding her joint pain. (R. 339). During this appointment, Plaintiff stated that she was experiencing stiffness, fatigue and increasing pain, particularly in her hips. (Id.). Plaintiff further stated that she was limited to two hours of standing, walking or sitting at any given time. (Id.). After an examination, Plaintiff was noted to possess

"multiple" fibromyalgia trigger points, although the exact number was not documented. (R. 340). Plaintiff's weight was also noted to be 184.8 pounds. (R. 339). After the examination, Plaintiff was diagnosed with fibromyalgia and obesity and prescribed phentermine, an appetite suppressant. (R. 340).

On April 20, 2011, Plaintiff presented to the Family Medical Clinic, complaining of her weight. (R. 337). After an examination, Plaintiff was noted to be moderately obese. (Id.). Her diagnosis of fibromyalgia was documented as a complication of her obesity. (Id.). For treatment, Plaintiff's prescription of phentermine was refilled. (R. 338).

On January 5, 2012, Plaintiff returned to the Family Medical Clinic, complaining of a possible urinary tract infection ("UTI"). (R. 392). During this visit, Plaintiff also complained of anxiety and difficulty sleeping. (Id.). After an examination, Plaintiff was prescribed an antibiotic for the possible UTI and cyclobenzaprine for her difficulty sleeping. (See R. 393). Plaintiff's prescription of citalopram was also increased for her complaints of anxiety. (Id.).

On February 20, 2012, Plaintiff presented to the emergency room at United Hospital Center, complaining of right arm pain. (R. 503). Specifically, Plaintiff stated that she had fallen five weeks prior and landed on her right arm, which had been painful since. (Id.). After an examination, Plaintiff was noted to have normal muscle tone and strength in her right arm and to have no obvious visual abnormalities. (R. 505, 507). X-rays of Plaintiff's right arm were ordered, which revealed no abnormalities, although "[t]he elbow and shoulder joints [were] not completely assessed." (R. 501). Plaintiff was diagnosed with an arm contusion, prescribed prednisone and Robaxin, a muscle relaxant, and discharged home. (R. 506-07).

On September 11, 2012, Plaintiff presented to the United Summit Center, a non-profit behavioral health center, for a mental health assessment.[2] (R. 527). Laura K. Wilson, a non-physician, performed the assessment. (Id.). Prior to the assessment, Plaintiff stated that she was seeking treatment because she does not "know how to live life." (Id.). Plaintiff further stated that she feels depressed almost every day and that she "has had mood concerns since she was young." (Id.). Finally, Plaintiff stated that she experiences difficulty interacting with others and has been withdrawing "more and more" from social interactions. (Id.). During the assessment, Plaintiff was noted to have a dysphoric mood, although she maintained "appropriate eye contact and was open and talkative." (R. 529). Afterwards, she was diagnosed with "major depressive disorder, recurrent, moderate." (Id.). For treatment, Plaintiff was scheduled for "a psychiatric diagnostic [evaluation] to determine if medications are appropriate" and for individual therapy sessions. (Id.).

On September 16, 2012, Plaintiff presented to the emergency room at St. Joseph's Hospital, complaining of left hip pain. (R. 423). Plaintiff stated that the pain increased with prolonged sitting. (Id.). After an examination, Plaintiff was diagnosed with "left sciatica," prescribed prednisone and Robaxin and discharged home. (R. 433).

On October 1, 2012, Plaintiff returned to the emergency room at St. Joseph's Hospital, complaining of moderate left-sided sciatica that had been "episodic for several weeks." (R. 425). X-rays of Plaintiff's left hip and pelvis were ordered, which revealed no abnormalities. (R. 427, 431). Plaintiff was given an injection of Depo-Medrol, a

---

[2] Plaintiff was referred to the United Summit Center by Wilda Posey, M.A., a state agency psychologist, "following a psychological evaluation for [DIB]." (R. 527). Dr. Posey's psychological evaluation is discussed in Part III.B.3.e.

corticosteroid, for the pain. (R. 427). She was also prescribed Tylenol #3, cyclobenzaprine and prednisone for the pain and discharged home. (R. 426).

On October 10, 2012, Plaintiff presented to the United Summit Center for a psychiatric diagnostic evaluation. (R. 536). Prior to the evaluation, Plaintiff stated that she suffered from depression and anxiety. (Id.). She further stated that she experienced difficulty concentrating and "can't [ever] get anything done." (Id.). During the evaluation, Plaintiff was noted to maintain good eye contact, be cooperative and possess an above-average cognitive level, "although [her cognitive level was] not formally tested." (R. 537). Plaintiff was also noted to have an "okay, but depressed" mood. (Id.). After the evaluation, Plaintiff was diagnosed with major depressive disorder and post-traumatic stress disorder ("PTSD") and her Global Assessment of Functioning ("GAF") score was calculated to be 55 out of 100. (Id.). To treat Plaintiff's mental symptoms, her prescription of citalopram was changed to Cymbalta and Plaintiff was instructed to start Neurontin in three weeks for her mood. (R. 538).

On October 18, 2012, Plaintiff changed her primary care facility from the Family Medical Clinic to the Shinnston Medical Center. (R. 514). When establishing as a new patient at the Shinnston Medical Center, Ned A. Hess, PA-C ("PA-C Hess"), a physician's assistant, was assigned as Plaintiff's health care provider. (See id.). PA-C Hess noted that Plaintiff had been diagnosed with fibromyalgia, PTSD, depression and GERD and that her medications included Cymbalta, naproxen and omeprazole. (Id.). When interviewing Plaintiff, Plaintiff stated that she was experiencing pain related to her sciatica. (Id.). Plaintiff explained that her pain extended "from the back of her left buttock to the bottom of her feet" and that, on May 26, 2012, the pain had become so severe

that she "couldn't walk." (Id.). Plaintiff described the pain as "a burning numbness" and a "pins and needles sensation." (Id.). PA-C Hess examined Plaintiff, noting "some diffuse left-sided lumbar tenderness with spasm." (Id.). After the examination, PA-C Hess diagnosed Plaintiff with sciatica and documented that Plaintiff "has severe symptoms with this nerve compression." (Id.). For immediate pain relief, he administered injections of Solu-Medrol and Depo-Medrol. (Id.). For long-term pain relief, he prescribed cyclobenzaprine and Lyrica. (Id.). He also instructed Plaintiff to keep taking naproxen and scheduled her for an MRI of her lumbar spine. (Id.).

On October 31, 2012, Plaintiff presented to United Hospital Center for the MRI of her lumbar spine. (R. 441). The MRI revealed:

> [A] small focal warea of ovoid abnormal signal in the left spinal canal near the left facet joint at L4-L5 causing displacement of the left L5 nerve root in the canal. This may emanate from the adjacent facet joint, perhaps a facet joint cyst or osteophyte. It is new from the prior study and the possibility it could represent an extruded disc fragment is raised although if so, it does not appear contiguous with any adjacent disc space and no definite donor site is seen.

(R. 442). After the MRI was completed, Plaintiff was advised to undergo an "ultrasound of the pelvic area because of a possible cystic mass." (R. 516). Subsequently, PA-C Hess ordered a pelvic ultrasound and a transvaginal ultrasound. (Id.). The transvaginal ultrasound revealed a "[c]omplex cystic area within the right ovary [and a] . . . small amount of fluid within the endometrial canal." (R. 438-39). The pelvic ultrasound was "unremarkable," although the "left ovary [was] not visualized." (R. 440).

On November 7, 2012, Plaintiff returned to PA-C Hess' office for a follow-up appointment regarding her sciatica. (R. 516). During this appointment, Plaintiff stated that naproxen and Lyrica were "giving her relief" from her pain. (Id.). Plaintiff further

stated that Cymbalta was "helping with her depression as well as the pain." (Id.). After an examination, PA-C Hess changed Plaintiff's diagnosis of "sciatica" to "chronic back pain with radiculopathy." (Id.). To treat her pain, PA-C Hess administered another injection of Solu-Medrol and Depo-Medrol. (Id.). PA-C Hess also scheduled an appointment for Plaintiff with a neurosurgeon. (Id.). Two weeks later, on November 21, 2012, Plaintiff returned for a medication refill and Pa-C Hess prescribed crutches for her upon her request. (R. 517).

On December 5, 2012, Plaintiff presented to the West Virginia University ("WVU") Neurosurgery, Spine and Pain Center at United Hospital Center for an appointment with Bill Dean Underwood, M.D., Ph.D., a neurosurgeon. (R. 443, 448). During this appointment, Plaintiff stated that she was suffering from left leg pain that had started in the previous six months. (Id.). Plaintiff explained that the pain originated "in [the] left gluteal region and radiate[d] into the lateral thigh, calf and foot." (Id.). Plaintiff further explained that, in addition to pain, she was experiencing "some numbness" in her left lateral foot and that the pain and numbness worsened with activity. (Id.). Dr. Underwood ordered an MRI of Plaintiff's lumbar spine, which revealed "a left sided synovial cyst at L4-L5 that appears to be displacing the left L5 nerve root[,] . . . facet arthrosis on the left . . . [and] degenerative disc changes . . . in the lower lumbar spine." (R. 444). After the MRI results were reviewed, Dr. Underwood discussed with Plaintiff her surgical options. (Id.). Plaintiff stated that she "would like to proceed with surgery," for which an appointment was made. (Id.). Therefore, when Plaintiff returned to the WVU Neurosurgery, Spine and Pain Center on December 11, 2012, continuing to complain of left leg pain, no action was taken in lieu of her upcoming surgery. (R. 446-47).

On December 13, 2012, Plaintiff underwent "a left L4-L5 hemilaminectomy with removal of synovial cyst." (R. 444, 479-80). Dr. Underwood performed the surgery. (R. 479-80). After noting that Plaintiff had tolerated the procedure well, Dr. Underwood discharged Plaintiff home that same day. (R. 479-80, 448).

After her surgery, Plaintiff returned to the WVU Neurosurgery, Spine and Pain Center for multiple follow-up appointments with Dr. Underwood. During her follow-up appointment on December 21, 2012, Plaintiff stated that she had started walking every day for exercise. (R. 449). Plaintiff further stated that, soon after she started exercising, she began experiencing low back pain and bilateral leg fatigue. (Id.). Dr. Underwood documented that, although Plaintiff was prescribed naproxen for pain, she "ha[d] not been involved in pain management to this point." (Id.). Dr. Underwood then examined Plaintiff, noting that her radicular pain had significantly improved and that her overall level of pain had decreased since her surgery. (R. 448). After the examination, Dr. Underwood documented that he was "happy with [Plaintiff's] progress thus far." (Id.).

During her follow-up appointment with Dr. Underwood on January 18, 2013, Plaintiff continued to complain of bilateral leg fatigue. (R. 450). Plaintiff explained that "[she has] no specific back pain or leg pain, just a feeling of tiredness in her [legs]." (R. 451). After an examination, Dr. Underwood referred Plaintiff to "physical therapy for her lumbar spine." (Id.). Subsequently, Plaintiff started receiving therapy sessions from Bridgeport Physical Therapy. (See R. 545-98).

During her follow-up appointment with Dr. Underwood on February 13, 2013, Plaintiff complained of "minimal left lateral calf pain[,] . . . left lateral calf paresthesias and occasional lower back pain." (R. 452, 454). Plaintiff stated that these symptoms

"somewhat limit her in her activities." (R. 454). Dr. Underwood examined Plaintiff, noting that she was "doing very well" and that she "ha[d] significantly improved after [her] surgery." (R. 452, 454). After the examination, Dr. Underwood instructed Plaintiff to continue her physical therapy sessions. (R. 453).

On February 22, 2013, Plaintiff presented to PA-C Hess' office, complaining of chronic shoulder and neck pain. (R. 519). Regarding her shoulder pain, Plaintiff stated that she had fallen one year ago and "had [experienced] constant pain toward the back of [her] shoulder ever since." (Id.). Plaintiff explained that, when she had fallen, her right shoulder had dislocated but that she had been "able to reduce it [herself]." (Id.). Regarding her neck pain, Plaintiff stated that she "had [sustained] whiplash 20 years ago after wrecking a four-wheeler." (Id.). Plaintiff further stated that, while X-rays after the accident revealed no abnormalities, she has experienced a diminished range of motion of her neck, numbness of her right arm and hands and a weakened grip since the accident. (Id.). While examining Plaintiff, PA-C Hess noted that Plaintiff suffered from decreased range of motion in her right arm and "some mild . . . tenderness [and] limited lateral movement" in her neck. (Id.). PA-C Hess diagnosed Plaintiff with "[c]hronic shoulder pain with history of dislocation, suspect frozen shoulder" and cervical strain with neuropathy. (Id.). To treat her pain, PA-C Hess instructed Plaintiff's physical therapist to address her right shoulder and neck impairments, in addition to her lumbar spine, in their sessions. (Id.). PA-C Hess also ordered X-rays of Plaintiff's right shoulder and neck, which revealed no abnormalities. (R. 519, 475-76). Finally, PA-C Hess instructed Plaintiff to keep taking naproxen, which she stated "has been helping." (R. 519).

On March 27, 2013, Plaintiff returned to PA-C Hess' office for a follow-up appointment regarding her right shoulder and neck pain. (R. 521). During this appointment, PA-C Hess noted that Plaintiff "has been working with physical therapy and her symptoms aren't as severe." (Id.). However, PA-C Hess further noted that Plaintiff "claims that the physical therapist told her . . . her [sacroiliac joint ("SI")] is out of place and they have had to get [it] back in alignment with every visit." (Id.). Therefore, PA-C Hess added "SI joint instability" to Plaintiff's list of diagnoses and recommended that Plaintiff discuss the diagnosis with Dr. Underwood at her next surgical follow-up appointment. (Id.). To treat Plaintiff's shoulder pain, the purpose of the appointment, PA-C Hess injected cortisone into Plaintiff's right shoulder, which Plaintiff stated was effective. (Id.).

On March 29, 2013, Plaintiff presented for another surgical follow-up appointment with Dr. Underwood. (R. 455). During this appointment, Dr. Underwood noted that Plaintiff had completed her physical therapy sessions, after receiving a total of eighteen sessions. (See R. 456, 596). As instructed by PA-C Hess, Plaintiff informed Dr. Underwood that "her right SI joint keeps coming out" and that she was experiencing "right-sided SI joint pain" that occasionally radiated to her right leg. (R. 455, 457). Dr. Underwood examined Plaintiff, noting some SI joint tenderness on the right side. (R. 457). After the examination, Dr. Underwood referred Plaintiff "to Dr. Stuart for possible [SI] joint injection[s]." (R. 456).

On August 19, 2013, Plaintiff presented to PA-C Hess' office, complaining of back pain. (R. 522). During this visit, Plaintiff stated that the cortisone injection she had received during her last appointment "did her well for a few weeks [but] then her [right

shoulder pain] . . . slowly recurred[,] although . . . not as severe." (Id.). Plaintiff further stated that her therapist at the United Summit Center had changed her Cymbalta prescription to citalopram because Cymbalta "made her irritable." (Id.). During an examination, PA-C Hess noted "[t]here continues to be some joint tenderness with adequate range of motion." (R. 523). After the examination, PA-C Hess administered an additional cortisone injection into Plaintiff's right shoulder to treat her continuing pain. (Id.).

On August 23, 2013, Plaintiff presented to the WVU Neurosurgery, Spine and Pain Center for her referral appointment with Dr. Stuart. (R. 458). During the referral, Dr. Stuart interviewed Plaintiff regarding her low back pain. (Id.). Plaintiff reported, *inter alia*, that her pain "initially began in April 2012 following surgery to remove a synovial cyst in her lumbar spine." (Id.). Plaintiff further reported that the pain causes her to feel exhausted, nauseated and "tortured." (Id.). Finally, Plaintiff reported that the pain limits her daily activities. (Id.). To illustrate, Plaintiff stated that the pain "interferes extremely with household chores, yard work, shopping, recreation/hobbies, physical exercise and sleep." (Id.). Plaintiff also stated that the pain "interferes quite a bit with socializing with friends, moderately with having sexual relations, and [a] little bit with appetite." (Id.).

After the interview, Dr. Stuart diagnosed Plaintiff with chronic low back pain, lumbar disc degeneration, sacroiliitis, greater trochanteric bursitis and "[p]rior treatment failures including physical therapy, [n]aproxen, Tylenol #3, oral steroids, Lyrica and Neurontin." (R. 460). Dr. Stuart scheduled an appointment for Plaintiff to receive a right SI joint injection and a right greater trochanteric bursa injection. (Id.). On September 18, 2013, Plaintiff received both injections, which she tolerated well. (R. 471-73).

On September 26, 2013, Plaintiff presented to PA-C Hess' office, complaining that "[s]he's [recently] been more irritable and moody [than usual]." (R. 525). After an examination, PA-C Hess changed Plaintiff's prescription of citalopram to Zoloft. (R. 526). PA-C Hess also documented that Plaintiff had been examined by a specialist regarding her chronic right shoulder pain and that the specialist had "advised no further cortisone [injections] at this period of time." (Id.).

On October 2, 2013, Plaintiff presented to the United Summit Center for a second mental health assessment, to monitor her treatment progress. (R. 531). Maria H. Huffman, a non-physician, performed the assessment. (Id.). Prior to the assessment, Plaintiff stated that she has suffered from depression and anxiety for over five years and that her symptoms "[occur] every day and . . . interfere with her life significantly." (Id.). Plaintiff further stated that she "stays in her bedroom most of the time and has little interaction with other people." (Id.). Finally, Plaintiff stated that she has never received "any other treatment for mental illness besides a psychological evaluation for [DIB]." (Id.). During the assessment, Plaintiff was noted to have a euthymic mood, although she maintained good eye contact and was cooperative. (R. 532). Afterwards, her diagnosis of "major depressive disorder, recurrent, moderate," with which she had been diagnosed during her first mental health assessment, remained unchanged. (Id.). Regarding Plaintiff's treatment, Ms. Huffman documented that Plaintiff "will [continue] low end, individual therapy services" and that Plaintiff "does not wish to receive any other services at this time." (R. 533).

### 3. Medical Reports/Opinions

#### a. Treating Source Statement by Frank D. Swisher, M.D., May 13, 2011

On May 13, 2011, Frank D. Swisher, M.D.,[3] of the Family Medical Clinic, completed a Treating Source Statement on behalf of Plaintiff. (R. 358-59). In this statement, Dr. Swisher declared that Plaintiff had been diagnosed with fibromyalgia and that, "due to her fibromyalgia, she [suffers from] depression, anxiety and insomnia." (R. 358). Dr. Swisher further declared that Plaintiff's mental impairments cause functional limitations. (Id.). To illustrate, Dr. Swisher stated that Plaintiff is limited to "1-2 [hours] of activity before needing a rest period." (Id.). Finally, Dr. Swisher declared that Plaintiff is prescribed Celexa, an antidepressant, for her mental impairments and that she has not been referred by the Family Medical Clinic for mental health treatment. (Id.).

### b. Disability Determination Examination by Bennett D. Orvik, M.D., June 12, 2011

On June 12, 2011, Bennett D. Orvik, M.D., a state agency medical consultant, performed his first Disability Determination Examination of Plaintiff. (R. 360-66). This Disability Determination Examination consisted of a clinical interview and a physical examination of Plaintiff. (See id.). During the clinical interview, Plaintiff informed Dr. Orvik that she suffers from muscle stiffness, arthritic pain in her wrists and ankles, neck pain from "some type of neck injury [that occurred] several years ago" and tenderness in various muscles. (R. 360). She further informed Dr. Orvik that she had been diagnosed with fibromyalgia by her primary care physician but that the diagnosis had not been confirmed by a rheumatologist. (Id.). Finally, she informed Dr. Orvik that she possesses a significant history of anxiety and depression. (Id.).

---

[3] Like the other signatures on Plaintiff's treatment records from the Family Medical Clinic, the signature on the Treating Source Statement is illegible. However, Plaintiff states that Dr. Swisher completed the Treating Source Statement, which the undersigned will accept as true for the purposes of this Report and Recommendation.

After the clinical interview, Dr. Orvik performed a physical examination of Plaintiff. (R. 361-63). While this examination revealed mostly normal findings, Dr. Orvik noted several abnormal findings. (See id.). When summarizing these findings, Dr. Orvik stated simply that Plaintiff "ha[s] some range of motion abnormalities." (R. 363).

After completing the clinical interview and physical examination of Plaintiff, Dr. Orvik concluded that Plaintiff suffers from: (1) an unconfirmed diagnosis of fibromyalgia; (2) depression; (3) osteoarthritis and (4) an anxiety disorder. (R. 363). Dr. Orvik further concluded that Plaintiff's "treatment appears to be generally appropriate" but that her prognosis "is difficulty to evaluate" due to her unconfirmed diagnosis of fibromyalgia. (Id.). Ultimately, Dr. Orvik recommended that Plaintiff visit a rheumatologist for "evaluation of her rheumatologic difficulties." (Id.).

### c. Mental Status Examination by Morgan D. Morgan, M.A., June 17, 2011

On June 17, 2011, Morgan D. Morgan, M.A., a state agency psychologist, performed a Mental Status Examination of Plaintiff. (R. 368-72). Prior to this examination, Dr. Morgan noted that Plaintiff's chief complaints include fibromyalgia and osteoarthritis, which both "began in 2005." (R. 368). Dr. Morgan further noted that Plaintiff has experienced "lifelong problems with anxiety and depression." (Id.).

The Mental Status Examination consisted of a clinical interview and a mental assessment of Plaintiff. (Id.). During the clinical interview, Plaintiff informed Dr. Morgan that "she had been sexually abused and physically abused from early childhood into her teens" and that, due to this abuse, she was "avoidant and experienc[ed] hypervigilance." (R. 369). Plaintiff further informed Dr. Morgan that she was placed into foster care at the age of fourteen, lived in foster care for two years and, after leaving foster care, either

lived with friends or was homeless. (R. 370). Finally, Plaintiff informed Dr. Morgan that

her husband "had previously been abusive and drank too much alcohol" but that "their

relationship has improved since he stopped drinking. (Id.).

After interviewing Plaintiff, Dr. Morgan performed a thorough mental assessment

of Plaintiff. (See R. 370-72). When summarizing his findings from this assessment, Dr.

Morgan stated that:

> [Plaintiff] was cooperative and compliant during the assessment, although
> tense. No abnormality was noted with posture or gait. Her mood was
> dysphoric and anxious, and her affect was restricted. [Plaintiff's] insights
> were deemed to be deficient. Her immediate, recent, and remote recall
> were within normal limits. Her concentration was within normal limits. She
> displayed motor tension.

(R. 371). After completing the Mental Status Examination, Dr. Morgan concluded that

Plaintiff suffers from the following mental impairments: (1) major depressive disorder;

(2) PTSD and (3) pain disorder. (Id.). Dr. Morgan further concluded that Plaintiff's

prognosis is poor. (Id.).

### d. Psychiatric Review Technique and Mental Residual Functional Capacity Assessment by Frank Roman, Ed.D., June 30, 2011

On June 30, 2011, Frank Roman, Ed.D., completed a Mental Residual Functional

Capacity ("RFC") Assessment of Plaintiff and a Psychiatric Review Technique form. (R.

374-91). When completing the Psychiatric Review Technique form, Dr. Roman initially

noted that Plaintiff suffers from affective disorders and anxiety-related disorders. (R.

374). Dr. Roman then analyzed the degree of Plaintiff's functional limitations. (R. 384).

Specifically, Dr. Roman rated Plaintiff's limitations in her activities of daily living as

"mild." (Id.). Dr. Roman also rated Plaintiff's difficulties in maintaining social functioning

and difficulties in maintaining concentration, persistence or pace as "moderate." (Id.).
Finally, Dr. Roman rated Plaintiff's episodes of decompensation as "none." (Id.).

When completing the Mental RFC Assessment, Dr. Roman determined that
Plaintiff is not significantly limited in understanding and memory or in adaptation. (R.
388-89). Nevertheless, Dr. Roman further determined that Plaintiff possesses limitations
in social interaction and in sustained concentration and persistence. (Id.). Regarding
Plaintiff's limitations in social interaction, Dr. Roman found that Plaintiff is not
significantly limited in her abilities to: (1) interact appropriately with the general public;
(2) ask simple questions or request assistance or (3) maintain socially appropriate
behavior and to adhere to basic standards of neatness and cleanliness. (R. 389).
However, Dr. Roman further found that Plaintiff is moderately limited in her abilities to:
(1) accept instructions and respond appropriately to criticism from supervisors and (2)
get along with coworkers or peers without distracting them or exhibiting behavioral
extremes. (Id.).

Regarding Plaintiff's limitations in sustained concentration and persistence, Dr.
Roman found that Plaintiff is not significantly limited in her abilities to: (1) carry out very
short and simple instructions; (2) carry out detailed instructions; (3) sustain an ordinary
routine without special supervision and (4) make simple work-related decisions. (R.
388). However, Dr. Roman further found that Plaintiff is moderately limited in her
abilities to: (1) maintain attention and concentration for extended periods; (2) perform
activities within a schedule, maintain regular attendance and be punctual within
customary tolerances; (3) work in coordination with or proximity to others without being
distracted by them and (4) complete a normal workday and workweek without

interruptions from psychologically based symptoms and perform at a consistent pace

without an unreasonable number and length of rest periods. (R. 388-89). After

completing the Mental RFC Assessment, Dr. Roman concluded that Plaintiff retains the

RFC to "follow routine duties in a low production setting with minimal decision making

and use of judgment[,] . . . interact with peers and the public on a casual basis and

respon[d] to supportive supervision." (R. 386, 390).

### e. Mental Status Evaluation by Wilda Posey, M.A., June 26, 2012

On June 26, 2012, Wilda Posey, M.A., a state agency psychologist, performed a

Mental Status Evaluation of Plaintiff. (R. 403-08). This evaluation consisted of a clinical

interview and a mental assessment of Plaintiff. (R. 403). During the clinical interview,

Plaintiff discussed with Dr. Posey, *inter alia*, her childhood and mental symptoms and

limitations. (R. 404-07). Regarding her childhood, Plaintiff informed Dr. Posey that:

> I have always had problems being social and being around people. I
> always thought maybe it had something to do with my mother, because
> when I was a kid, my mother hated me. . . . She physically abused me
> beginning at 6 years old to 14 years old.

(R. 404). Plaintiff further informed Dr. Posey that, when she was fourteen years old, she

ran away from her mother and was placed in a foster home, where she was sexually

abused. (Id.). Regarding her mental symptoms and limitations, Plaintiff informed Dr.

Posey that she avoids social activities and that, if she does participate in a social

activity, her "mind freezes up" and she "feel[s] as if she is having an anxiety attack with

shortness of breath, feeling tense, restless and becoming nervous." (R. 407). Plaintiff

further informed Dr. Posey that she does not attempt to maintain personal relationships

and that, when she worked at Jo-Ann Fabrics and Crafts, she "would hide from the

people [she] knew." (R. 404, 407). Finally, Plaintiff informed Dr. Posey that she

experiences difficulty falling asleep and is only able to fall asleep if she takes a muscle relaxer. (R. 404).

After interviewing Plaintiff, Dr. Posey performed a thorough mental assessment of Plaintiff. (R. 406-07). While Plaintiff's mood "appeared to be anxious" during the assessment, Dr. Posey noted that Plaintiff was cooperative, demonstrated a sense of humor and maintained good eye contact. (R. 407). Dr. Posey also noted that Plaintiff's insight was fair and that her memory, concentration, persistence and pace were normal. (Id.). Finally, Dr. Posey noted that Plaintiff's thought content "appeared to contain preoccupations regarding being disliked by others." (Id.). After completing the Mental Status Examination, Dr. Posey concluded that Plaintiff suffers from social phobia and that her prognosis is guarded. (Id.).

### f. Disability Determination Examination by Bennett D. Orvik, M.D., July 2, 2012

On July 2, 2012, Bennett D. Orvik, M.D., a state agency medical consultant, performed his second Disability Determination Examination of Plaintiff. (R. 410-17). This examination consisted of a clinical interview and a physical examination of Plaintiff. (See id.). During the clinical interview, Plaintiff informed Dr. Orvik that she suffers from fibromyalgia, social anxiety disorder, depression, obesity, "trouble with her joints [and] . . . numbness in various areas." (R. 410). Plaintiff further informed Dr. Orvik that "she has too much pain to be able to work" but that "[b]eing around people is what bothers her the most." (R. 411). Finally, Plaintiff informed Dr. Orvik that she believes her symptoms are "getting worse." (Id.).

After the clinical interview, Dr. Orvik performed a physical examination of Plaintiff. (R. 411-13). This examination revealed mostly normal findings. (See id.). However, Dr.

Orvik noted several abnormal findings. (See id.). When summarizing these findings, Dr. Orvik stated that Plaintiff "ha[s] mild obesity and . . . some obvious decreased range of motion of the right shoulder." (R. 414). After completing the Disability Determination Examination, Dr. Orvik concluded that Plaintiff suffers from: (1) osteoarthritis, mainly of the right shoulder; (2) an unconfirmed diagnosis of fibromyalgia; (3) social anxiety disorder; (4) an anxiety disorder and (5) exogenous obesity. (R. 413). Dr. Orvik further concluded that Plaintiff's prognosis "is somewhat guarded" due to her unconfirmed diagnosis of fibromyalgia. (Id.).

### g. Disability Determination Explanation by Lawrence Annis, Ph.D., July 16, 2012

On July 16, 2012, Lawrence Annis, Ph.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 128-37). Prior to drafting the Initial Explanation, Dr. Annis reviewed Plaintiff's medical records, first Adult Function Report and first Personal Pain Questionnaire. (R. 129-30). After reviewing these documents, Dr. Annis concluded that Plaintiff suffers from the following non-severe impairments: (1) anxiety disorders and (2) "[o]steoarthrosis and [a]llied [d]isorders." (R. 132).

In the Initial Explanation, Dr. Annis completed a physical RFC assessment of Plaintiff. (R. 134-36). During this assessment, Dr. Annis found that, while Plaintiff possesses no visual, communicative or environmental limitations, Plaintiff possesses exertional, postural and manipulative limitations. (R. 134-35). Regarding Plaintiff's exertional limitations, Dr. Annis found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in

an eight-hour workday and (5) push and/or pull with no limitations. (R. 134). Regarding

Plaintiff's postural limitations, Dr. Annis found that Plaintiff is able to frequently balance

and occasionally climb ramps/stairs, stoop, crouch, kneel, climb ladders/ropes/scaffolds

and crawl. (R. 134-35). Finally, regarding Plaintiff's manipulative limitations, Dr. Annis

found that Plaintiff is limited in her abilities to reach to the "[r]ight in front and/or laterally"

and to the "[r]ight overhead" and that she is unlimited in her abilities to handle, finger

and feel. (R. 135). After completing the RFC assessment, Dr. Annis determined that

Plaintiff possesses the RFC to perform light work. (R. 136).

Also in the Initial Explanation, Dr. Annis completed a Psychiatric Review

Technique form. (R. 132-33). When completing this form, Dr. Annis analyzed the degree

of Plaintiff's functional limitations. (R. 132). Specifically, Dr. Annis found that Plaintiff

possesses no restriction in her activities of daily living and no difficulties in maintaining

concentration, persistence or pace. (Id.). Dr. Annis further found that Plaintiff possesses

"[m]ild" difficulties in maintaining social functioning. (Id.). Finally, Dr. Annis found that

Plaintiff experiences no episodes of decompensation. (Id.). After analyzing Plaintiff's

degree of functional limitation, Dr. Annis concluded that Plaintiff's "mental condition [is]

not more than mildly limiting" and that she retains "the mental capacity to perform [a]

range of routine tasks within her physical ability." (R. 133).

### h. General Physical Examination by Angela M. Mills, D.O., August 29, 2012

On August 29, 2012, Angela M. Mills, D.O., of the West Virginia Department of

Health and Human Resources' Medical Review Team, performed a General Physical

Examination of Plaintiff. (R. 420-24). Prior to this examination, Dr. Mills documented that

Plaintiff was being treated by Dr. Swisher for fibromyalgia, anxiety, depression and

osteoarthritis. (R. 420). Dr. Mills further documented that Plaintiff's neck, back and pelvis pain constitute her chief complaints. (Id.). Finally, Dr. Mills noted that Plaintiff "states [her pain] . . . bother[s] her so bad[ly] somedays [that] she can't get out of bed." (R. 420-21).

During the examination, Dr. Mills noted several abnormal findings. (R. 421). Specifically, Dr. Mills noted that Plaintiff experienced tenderness and spasms of the neck muscles, decreased sensation in her hands, anxiety problems, sciatica of her left leg and problems with flexion of the right arm and left leg. (Id.). Based on these findings, Dr. Mills diagnosed Plaintiff with anxiety and "fibromyalgia/[osteoarthritis]." (Id.). To treat Plaintiff's pelvic pain, Dr. Mills prescribed Plaintiff one crutch for her left side and recommended an MRI of her pelvis if the crutch failed to alleviate the pain. (R. 419, 422).

After the examination, Dr. Mills concluded that Plaintiff is not able to work full-time because her "pain keeps her from moving some days." (R. 420-21). Dr. Mills further concluded that Plaintiff's prognosis is fair, although she opined that the length of Plaintiff's incapacity would be lifelong because "no cure is available" for fibromyalgia. (R. 422-23). Finally, Dr. Mills concluded that Plaintiff should avoid lifting, standing or sitting for long periods of time because her "symptoms seem to worsen [with] strenuous [activity]." (Id.).

### i. Disability Determination Examination by Pedro F. Lo, M.D., October 22, 2012

On October 22, 2012, Pedro F. Lo, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 139-48). Prior to drafting the Reconsideration

Explanation, Dr. Lo reviewed the same documents that Dr. Annis had reviewed when drafting the Initial Explanation, in addition to Plaintiff's updated medical records and an updated Adult Function Report. (R. 140-42). After reviewing these documents, Dr. Lo agreed with all of Dr. Annis' conclusions contained in the Initial Explanation. (R. 146). Also in the Reconsideration Explanation, Joseph A. Shaver, Ph.D., a state agency psychologist, reviewed Dr. Annis' Psychiatric Review Technique form from the Initial Explanation, which he "affirmed as written." (R. 143-44).

### j. Case Analysis by Karen Roles, January 7, 2013

On January 7, 2013, Karen Roles, of the Office of Central Operations ("OCO") Flexible Disability Unit, performed a Case Analysis of Plaintiff's claim for DIB. (R. 418). However, Ms. Roles reviewed only Dr. Posey's Mental Status Evaluation dated June 26, 2012, and a consultative examination dated June 27, 2012,[4] stating that "[n]o additional medical records [were] available" to review. (Id.). Based on her review of Plaintiff's claim, Ms. Roles stated that she was "[u]nable to process a fully favorable determination" and referred the matter to the Office of Disability Adjudication and Review for a hearing. (Id.).

### k. Physical RFC Assessment by Ned A. Hess, PA-C, September 26, 2013

On September 26, 2013, Ned A. Hess, PA-C ("PA-C Hess"), completed a Physical RFC Assessment of Plaintiff. (R. 510-13). During this assessment, PA-C Hess found that, while Plaintiff possesses no communicative limitations, she does possess exertional, postural, manipulative, visual and environmental limitations. (Id.). Regarding

---

[4] The record does not indicate that Plaintiff underwent a consultative examination on June 27, 2012. However, the undersigned is uncertain as to which examination Ms. Roles intended to refer.

Plaintiff's exertional limitations, PA-C Hess found that Plaintiff is able to: (1) occasionally lift and/or carry less than ten pounds; (2) frequently lift and/or carry less than ten pounds; (3) stand and/or walk for approximately less than two hours in an eight-hour workday; (4) must periodically alternate sitting and standing to relieve pain or discomfort and (5) push and/or pull with some limitations in her upper extremities. (R. 510). Regarding Plaintiff's postural limitations, PA-C Hess found that Plaintiff is able to occasionally balance, stoop, kneel and crawl and never crouch or climb ramps, stairs, ladders, ropes or scaffolds. (R. 511). Regarding Plaintiff's manipulative limitations, PA-C Hess found that Plaintiff is limited in her abilities to reach in all directions, handle, finger and feel. (R. 512). Regarding Plaintiff's visual limitations, PA-C Hess found that Plaintiff is limited in near acuity. (Id.). Finally, regarding Plaintiff's environmental limitations, PA-C Hess found that Plaintiff must avoid concentrated exposure to extreme cold and wetness. (R. 513).

## C.     Testimonial Evidence

During the administrative hearing on January 28, 2014, Plaintiff divulged her relevant personal facts and work history. (R. 68-73). While Plaintiff is married and has one child, age twenty-six, Plaintiff lives alone in "a separate household" from her husband and child.[5] (R. 68, 70). Plaintiff graduated from college with a bachelor's degree in education. (R. 68). She has worked as, *inter alia*, a teacher, telemarketer, home health aide and drier operator. (R. 71-73). Most recently, she worked as a

---

[5] Plaintiff's son has Asperger's syndrome. (R. 83). While Plaintiff's husband resides with their son and assists with all of his physical needs, Plaintiff and her stepdaughter also help care for Plaintiff's son. (R. 83-85). Plaintiff explains that her duties are to "make him a list [every week] . . . [detailing] what he should do on each day" and to "try to keep him motivated." (Id.).

salesperson at Jo-Ann Fabrics and Crafts, where she cut fabric, stocked shelves and operated cash registers. (R. 70).

Plaintiff testified that she suffers from physical impairments, including back problems and fibromyalgia. (R. 73-75). Regarding Plaintiff's back problems, Plaintiff has a "cyst on [her] spine" that causes her pain. (R. 73-74). Regarding her fibromyalgia, Plaintiff explains that the condition causes her joints to feel stiff and painful and her hips to "lock" at times. (Id.). Plaintiff further explains that, when she "bump[s]" against an object, she feels temporary, excruciating pain. (R. 74). To treat her pain, Plaintiff is prescribed naproxen and hydrocodone, which alleviate but do not eliminate the pain. (R. 74-75). However, these medications "make [her] sleepy," resulting in Plaintiff "lay[ing] down a lot." (Id.).

Plaintiff testified regarding the symptoms and limitations that her physical impairments cause. (R. 74-82). First, Plaintiff states that her fibromyalgia makes rising in the morning difficult and that "[i]t . . . takes [her] a couple of hours before [she] feels like [she] can do anything." (R. 74). Second, Plaintiff states that she experiences difficulty walking. (R. 75-76, 82). Plaintiff's hips and ankles "lock up" when she walks, causing her to walk "at a slower pace than [she is] used to." (R. 75). While Plaintiff uses a cane when necessary, she has fallen in the past and remains at risk for falls. (R. 75-76). She is able to walk less than two-tenths of a mile without resting. (R. 82). Third, Plaintiff experiences difficulty lifting objects. (Id.). While she is able to lift fifteen to twenty pounds, she is only able to carry "less than [ten] pounds." (Id.). Fourth, Plaintiff experiences difficulty standing. (R. 75, 82). She is able to stand for fifteen to twenty minutes at a time but no longer. (R. 82). Fifth, Plaintiff experiences difficulty sitting. (R.

81). She is able to sit for fifteen to twenty minutes at a time. (Id.). Sixth, Plaintiff must frequently change positions for pain relief. (R. 74, 79-80). To illustrate, Plaintiff states that, when riding in a vehicle, she will alternate between sitting in the passenger seat and laying down in the backseat. (R. 79-80). Nevertheless, despite her symptoms and limitations, Plaintiff testified that she is able to shop for groceries, weed her garden and clean her house, although her husband and son help with the housework. (R. 77-79).

In addition to physical impairments, Plaintiff testified that she suffers from mental impairments, including depression and PTSD. (R. 77). Plaintiff's mental impairments cause her to "avoid people as much as possible" and to avoid leaving her home. (Id.). Plaintiff discloses that, if she recognizes someone in public, she will "pretend like [she] didn't see them" to avoid any interaction. (Id.). Plaintiff's mental impairments also cause her to experience "focus problems." (R. 80). To illustrate these problems, Plaintiff states that she is easily distracted and that her thoughts tend to wander. (Id.).

Finally, Plaintiff testified regarding her daily activities. (R. 84-85). On a typical day, Plaintiff remains in bed for approximately half an hour after awakening. (R. 84). Upon rising, Plaintiff checks her email, drinks coffee and "kind of loosen[s] up a little for a couple of hours." (Id.). After loosening up, Plaintiff creates a list "of what [she's] willing to do for the day," gets dressed and starts to complete the items on her list, although at "the end of the day [she doesn't] have a lot done." (Id.). At times, Plaintiff browses Facebook, reads and plays games on her tablet. (R. 85). At the end of the day, Plaintiff watches television. (Id.).

**D.    Vocational Evidence**

      **1.  Vocational Testimony**

Larry Bell, an impartial vocational expert, also testified during the administrative hearing on January 28, 2014. (R. 87-92). Initially, Mr. Bell testified regarding the characteristics of Plaintiff's past relevant work. (R. 88). Regarding Plaintiff's most recent employment position as a clerk cashier, Mr. Bell characterized the work as light and semiskilled. (Id.). As for Plaintiff's prior work as a telemarketer, home health aide, teacher and drier operator, Mr. Bell characterized the work as sedentary and semiskilled, medium and semiskilled, light and skilled and medium and unskilled, respectively. (Id.).

After characterizing Plaintiff's past relevant work, the ALJ presented her first hypothetical question for Mr. Bell's consideration. Specifically, the ALJ asked Mr. Bell to:

> [A]ssume an individual the same age, education, and work background as the claimant who's capable of performing light work as defined in the regulations, but has the following limitation: there should be a sit/stand option which would allow for a brief change of position for one to two minutes at least every 30 minutes; there should be no crouching, no crawling, no climbing of ladders, ropes, or scaffolds; no more than occasional balancing, stooping, or climbing of stairs or ramps; should be no concentrated exposure to extreme heat and cold, no vibration or hazards such as dangerous moving machinery or unprotected heights; the work should be limited to simple, routine, and repetitive instructions and tasks; there should be no contact with the public; no more than occasional interaction with coworkers and supervisors.
>
> Would such a person be able to perform [Plaintiff's] past work?

(R. 89). In response to the hypothetical, Mr. Bell testified that such an individual would not be able to perform Plaintiff's past work but that the individual could work as a cleaner or garment and laundry folder. (Id.).

The ALJ then altered her hypothetical question several times. First, the ALJ added to the hypothetical the limitation that the individual must use a cane while walking and eliminated the restriction on standing. (R. 90). Mr. Bell testified that the individual

could still work as a cleaner or garment and laundry folder. (R. 91). Second, the ALJ reduced the exertional level of the hypothetical to sedentary and kept the restriction of using a cane while walking. (Id.). Mr. Bell testified that the individual could no longer work as a cleaner or garment and laundry folder but could work as a bench worker or general sorter. (Id.). Third, the ALJ kept the exertional level at sedentary but altered the "sit/stand option . . . to change positions every [thirty] minutes between standing and sitting." (R. 92). Mr. Bell testified that the individual could still work as a bench worker or general sorter. (Id.).

After these hypothetical questions, the ALJ asked Mr. Bell several more questions. First, the ALJ asked Mr. Bell "how much time off task is generally permissible" in the job positions he identified. (R. 91). Mr. Bell testified that, if an individual is off task "[ten percent] or more of the time," then the individual would be precluded from competitive work at any exertional level. (Id.). Second, the ALJ asked "what . . . level of absenteeism [is] generally acceptable." (Id.). Mr. Bell testified that, if an individual is absent from work two or more days per month, then "intervention would [most likely] be attempted [by] the supervisor and[,] if that wasn't successful, it would . . . result in termination." (R. 92). After the ALJ completed her questions, Plaintiff's counsel, Mr. Bailey, also presented a question for Mr. Bell's consideration. (Id.). Specifically, Mr. Bailey asked whether laying down at work is considered being off task, to which Mr. Bell replied in the affirmative. (Id.).

### 2. Report of Contact Forms, Work History Reports & Disability Reports

In an undated Work History Report submitted by Plaintiff, Plaintiff indicated that she has worked approximately five job positions in the past fifteen years. (R. 261-66).

Specifically, Plaintiff has worked as a teacher, home health aide, drier operator, fast food worker and, most recently, sales clerk for Jo-Ann Fabrics and Crafts. (R. 261). When describing the duties of her most recent position, Plaintiff stated that she stocked shelves, assisted customers, cut fabric and operated the cash register. (R. 266). She explained that the position required her to "[u]se machines, tools or equipment" and to utilize "technical knowledge or skills." (Id.). She further explained that the position required her to: (1) stand and walk for four to eight hours a day; (2) handle large and small objects for four hours a day (3) reach, kneel, crouch and stoop for two hours a day and (4) frequently lift ten-pound bolts of fabric. (Id.). Finally, she explained that she was never required to crawl, sit or climb. (Id.).

On June 30, 2011, Patricia Dennison completed a report of contact form. (R. 267-68). In this form, Ms. Dennison opined that Plaintiff is capable of performing light exertional work with the following restrictions:

> No climbing ladders; occasional use of other postures. Avoid concentrated exposure to extreme cold and extreme heat. Can interact with peers and the public on a casual basis and respond to supportive supervision. [She] can perform work as salesperson as she describes it as she would not have to interact with customers on more than a casual basis.

(Id.). Ms. Dennison also analyzed Plaintiff's past relevant work, classifying her work as a drier operator and home health aide as medium exertional work and her work as a teacher, fast food worker and sales clerk as light exertional work. (Id.). Ultimately, Ms. Dennison concluded that Plaintiff is capable of performing her past work. (Id.).

On or about May 14, 2012, Plaintiff submitted a Disability Report.[6] (R. 269-77). In this report, Plaintiff indicated that the following impairments limit her ability to work: (1)

---

[6] A Disability Report from Plaintiff's previous claim for DIB is also a part of the record. (See R. 238-46). In this report, Plaintiff indicated that she could not work due to her

anxiety; (2) osteoarthritis; (3) fibromyalgia; (4) a social disorder/inability to get along with others and (5) obesity. (R. 270). Plaintiff further indicated that she stopped working on October 1, 2009, "[b]ecause of [her] condition(s)" and "[b]ecause of other reasons." (Id.). When explaining her "other reasons," Plaintiff stated that:

> Everywhere [she] work[s], there is eventually someone who starts picking on [her] for whatever reasons. [For example, she] had been [employed by JoAnn Fabrics and Crafts] for over a year when a new girl was hired who was determined to become the new assistant manager. [Plaintiff] was the only thing standing in [the girl's] way, except [Plaintiff] didn't want the position. [Plaintiff could not] handle the stress that goes with that position. When [the girl] started picking on [her], [Plaintiff] had to quit. [Plaintiff] was always in a state of anxiety when [she] had to work at the same time [the girl] did.

(Id.). Despite these other reasons, Plaintiff stated that she "was having trouble getting around" and "was going to stop working anyway." (Id.). Plaintiff estimated that her conditions became severe enough to keep her from working on November 1, 2009. (Id.). She listed citalopram, naproxen and cyclobenzaprine as her prescribed medications. (R. 273).

Plaintiff's counsel Mr. Bailey submitted two Disability Report-Appeal forms on behalf of Plaintiff. (R. 293-99, 308-16). On August 1, 2012, Mr. Bailey updated Plaintiff's list of medications to include omeprazole. (R. 295). Subsequently, on November 5, 2012, Mr. Bailey again updated Plaintiff's list of medications to include acetaminophen-codeine, Cymbalta, Lyrica, methocarbamol, steroid injections and "pain injection[s]." (R. 311-12).

**E.    Lifestyle Evidence**

**1.  First Adult Function Report, Undated**

---

fibromyalgia, depression, anxiety and arthritis. (R. 242). Her date of onset was listed as November 30, 2009. (Id.).

In an undated Adult Function Report submitted by Plaintiff, Plaintiff states that she is unable to work because her "anxiety makes [her] fearful of dealing with people." (R. 252). Plaintiff explains that:

> I'm not very adept socially. The longer I work at a place, the more I feel socially unacceptable. All my work history has been to eventually just stop going because I just haven't been able to make myself go back.

(Id.). Plaintiff states that she is also unable to work due to her depression, anxiety and fibromyalgia. (R. 252-54).

Plaintiff discloses that she is limited in some ways but not in others. In several activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to "take care of" her family by preparing meals, washing laundry and cleaning the house, although she must perform housework "little by little." (R. 255-56). She is able to take care of her pets, although her husband and son assist with all pet care. (Id.). She is able to pay bills, count change, handle a savings account and use a checkbook and money orders. (R. 257). She is able to complete tasks and follow written and spoken instructions. (R. 259). She is able to perform her own personal care, although she experiences difficulty dressing and on some days will not change out of her pajamas. (R. 255). Finally, Plaintiff is able to operate a motor vehicle independently for "short distances" and leave the house without accompaniment. (R. 257).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her physical and mental impairments. Regarding her physical impairments, Plaintiff's conditions affect her ability to lift squat, bend, stand, reach, walk, sit, kneel, climb stairs and use her hands. (R. 259). Plaintiff explains that "all [of her] joints are the problem." (Id.). Plaintiff states that she was very athletic prior to her

impairments but that she now is able to walk only a few yards before requiring "a couple minutes" of rest. (R. 255, 259). She further states that she "constantly ha[s] to change positions" to relieve her joint pain. (R. 259).

Regarding her mental impairments, Plaintiff's conditions affect her ability to, *inter alia*, complete tasks, concentrate, handle stress, handle changes to her routine, motivate herself and get along with others. (R. 259-60). Regarding her ability to get along with others, Plaintiff declares that she "do[esn't] know why [she] do[esn't] get along with people" but further declares that she is "too outspoken and do[esn't] know how to keep [her] mouth shut." (R. 259). She states that, due to her inability to get along with others, she was fired from a job at Weyerhauser, "not rehired [as a teacher] in Lewis County" and given a poor reference in Upshur County. (R. 260). Regarding her ability to motivate herself, Plaintiff states that she does not always clean her house "the way [she] should," bathe or change out of her pajamas. (R. 253, 255).

Finally, Plaintiff details her daily activities. Upon awakening, Plaintiff spends two to three hours "drinking coffee and reading while [her] body unstiffens." (R. 255). After she unstiffens, Plaintiff starts performing housework, taking breaks to sit or lay down as needed. (Id.). At mealtimes, Plaintiff prepares meals, including a "complete meal with 3-5 courses" if she is motivated and is having a "good day." (R. 256). At times throughout the day, Plaintiff may engage in one of her hobbies, which include reading, watching television, sewing, using her computer and gardening. (R. 258). In the summertime, Plaintiff "tr[ies] to do something with the garden every day," otherwise she gardens in "spurts." (Id.). However, even if it is not summer, Plaintiff goes outside every day. (R. 257). At night, Plaintiff falls asleep around 2:00 A.M. to 3:00 A.M. and "wake[s] up 2-4

[hours] later." (R. 255). Plaintiff goes shopping once a week and talks with friends on the telephone and visits her parents about once a month. (R. 257-58).

### 2. First Personal Pain Questionnaire, April 18, 2011

On April 18, 2011, Plaintiff submitted her first Personal Pain Questionnaire. (R. 247-51). In this questionnaire, Plaintiff states that she suffers from pain in her hips, wrists, ankles, shoulders, fingers, feet and back. (R. 247-49). Regarding her hip pain, Plaintiff characterizes the pain as aching, stabbing, cramping and throbbing in nature. (R. 247). She explains that the pain may last from fifteen minutes to an entire day. (Id.). She further explains that the pain is excruciating at times and prevents her from activities such as running, riding a bicycle and walking. (Id.). When describing factors that aggravate her pain, she lists walking, remaining in one position for too long and performing any activity that requires her to move her legs. (Id.). To relieve her pain, Plaintiff reports that she sits or lays down or changes positions. (Id.). To treat the pain, Plaintiff states that she takes naproxen, which is "[s]ometimes" effective. (R. 248). However, Plaintiff further states that naproxen causes her to feel drowsy. (Id.).

Regarding her wrist pain, Plaintiff characterizes the pain as aching, stabbing, cramping and throbbing in nature. (Id.). Plaintiff explains that the pain, like her hip pain, may last from fifteen minutes to an entire day. (Id.). When discussing aggravating factors, Plaintiff lists cold weather and activities that require wrist movement. (R. 249). Plaintiff states, however, that her wrists hurt even when she refrains from using them and that she "do[esn't] want to use [her] wrists when they hurt." (Id.). Plaintiff further states that she has not discovered a way to relieve her wrist pain and that, while she is prescribed naproxen, it is never effective. (Id.).

Regarding her ankle pain, Plaintiff characterizes the pain as aching, stabbing, cramping and throbbing in nature. (Id.). Plaintiff explains that the pain occurs five to ten times throughout the day and that, when it occurs, it may last for hours. (R. 250). Plaintiff further explains that her right ankle pain is more severe than her left ankle pain and that the pain causes her to limp when she walks. (Id.). When discussing aggravating factors, she lists cold weather and walking. (Id.). She states that nothing relieves the pain, including naproxen. (Id.).

Finally, regarding the pain in her shoulders, fingers, back and feet, Plaintiff states that the pain "last[s] the same length of time [and] for the same time period" as her other pain. (R. 251). She explains that "[s]ometimes everything hurts all together[,] which is almost unbearable," and that "[s]ometimes only one or two joints hurt." (Id.).

### 3. Second Adult Function Report, June 7, 2012

On June 7, 2012, Plaintiff completed her second Adult Function Report. (R. 278-87). In this report, Plaintiff explains that her physical and mental symptoms and limitations have worsened since her last Adult Function Report. (See id.). Regarding her physical symptoms, Plaintiff explains that she now experiences pain "all the time," including pain in her shoulders, feet, hips, thighs, wrists and ankles. (R. 278). Plaintiff further explains that she now experiences excruciating pain when she moves her arm away from her body. (Id.). When describing how these symptoms have affected her physical limitations, Plaintiff states that some days the pain in her feet "makes it impossible to get around to any real degree," although she estimates that she is able to walk one hundred yards before requiring only "a few seconds" of rest. (R. 285, 278). Additionally, Plaintiff states that she frequently drops items and experiences difficulty

sweeping, picking up items, mopping and vacuuming. (R. 278). Finally, Plaintiff states that she experiences difficulty performing her own personal care, including difficulty dressing, bathing, combing her hair and using the toilet. (R. 281).

Regarding her mental abilities, Plaintiff states that she now possesses numerous mental limitations. First, Plaintiff states that she lacks motivation and that "[m]any days [she] just do[esn't] feel like doing anything." (R. 278). Second, Plaintiff states that she is "not always" able to complete tasks, such as her chores. (R. 285). Third, Plaintiff states that she experiences difficulty concentrating and is only able to concentrate for about one hour. (Id.). Fourth, Plaintiff states that she experiences difficulty falling asleep. (R. 281). Fifth, Plaintiff states that, while she is able to follow written instructions, she experiences difficulty following spoken instructions and at times must "write things down." (R. 285). Finally, Plaintiff states that she "ha[s] trouble getting along with everyone" and "tr[ies] to stay away from people." (Id.). She explains that:

> People have been mean to me all my life. I don't know how to react to the shortcomings of other people. People tell lies all the time to makes themselves look good and others (me) look bad. It always crushes me to hear what people say. I just can't seem to rise above other people's preconceived notions of me. I feel like a failure in society. I feel like I've tried to the best of my ability and been rejected at every turn. Not only do I hurt all the time physically, but I just don't think I can face the world at large anymore mentally. I've not been a success at anything.

(R. 287).

Finally, Plaintiff describes her new daily routine. Plaintiff awakens around 7:30 A.M. or 8:00 A.M. (R. 281). After awakening, Plaintiff spends two hours drinking coffee, checking her email and preparing for the day. (Id.). She then starts performing housework. (Id.). She explains that "[it] takes all day to get things done" and that, if she starts cleaning on Monday, her housework will be completed by Friday. (Id.). At

approximately 2:00 P.M. each day, Plaintiff takes a break from her housework to nap for two hours. (Id.). At some point during the day, Plaintiff "talk[s] on [the] phone [or] chat[s] on [the] computer" with her friends. (Id.). In the evening, she prepares dinner for her family, such as soup and sandwiches. (Id.). After dinner, Plaintiff relaxes until at least 11:00 P.M. before going to bed. (Id.). In addition to her daily activities, Plaintiff visits her parents once a week and travels to BioLife Plasma Services to donate blood plasma twice a week. (R. 284).

### 4. Second Personal Pain Questionnaire, June 7, 2012

On June 7, 2012, Plaintiff submitted her second Personal Pain Questionnaire. (R. 288-92). In this questionnaire, Plaintiff states that she suffers from pain in her shoulders, hips, thighs, ankles and wrists. (R. 288-90). Regarding her shoulder pain, Plaintiff characterizes the pain as aching, stabbing, throbbing and continuous in nature. (R. 288). When describing factors that aggravate her pain, she lists cold weather, rainy weather and the act of moving her arm away from her body. (Id.). Plaintiff explains that, when she moves her arm away from her body, the pain is excruciating. (Id.). To treat the pain, Plaintiff states that she takes naproxen and Tylenol, which are "[s]ometimes" effective. (R. 289). However, Plaintiff further states that naproxen causes heartburn and nausea. (Id.).

Regarding her hip and thigh pain, Plaintiff characterizes the pain as aching, stabbing and throbbing. (Id.). Plaintiff explains that the pain can last "all day." (Id.). When describing her aggravating factors, she lists cold weather and rainy weather. (R. 290). To relieve her pain, Plaintiff reports that she lays down or changes position. (R. 289-90). She further reports that warm weather and heat relieve her pain. (R. 290). To

treat the pain, Plaintiff discloses that she takes naproxen and Tylenol, which are sometimes effective. (Id.).

Finally, regarding her ankle and wrist pain, Plaintiff characterizes the pain as aching, cramping and throbbing. (Id.). Plaintiff explains that, like her hip and thigh pain, the pain can last an entire day. (R. 291). Plaintiff further explains that, in addition to pain, her ankles swell and "lock [up]," which forces her to walk at a slow pace. (Id.). Plaintiff declares that her wrist pain deters her from performing activities that involve her wrists. (Id.). When discussing aggravating factors, she lists cool weather, rainy weather, using her wrists and "being on [her] feet any length of time." (Id.). Conversely, she lists warm weather as a factor that relieves her pain. (Id.). To treat the pain, Plaintiff states that she takes naproxen and Tylenol, which are sometimes effective. (Id.).

### 5. Third Adult Function Report, August 13, 2012

On August 13, 2012, Plaintiff completed her third Adult Function Report. (R. 300-07). In this report, Plaintiff explains that she is unable to work because:

> My body hurts all the time which makes it difficult to give my full attention to anything else. I take medicine for pain and inflammation. It helps somewhat but I still hurt. The medicine makes me sleep[y]. I don't take regular naps though. I sleep for a couple hours. And I even hurt in my sleep. I can't lift my right arm. My hip makes me limp. I lay down frequently to ease the pain somewhat. I don't go places I don't have to. I don't get along well with people. . . .
>
> My life has been turned upside down. I've gone from [being] a highly functioning human to a barely functioning one. I know life is hard for everyone but I just feel like I've had one too man[y] hard knocks and I just can't get back up. I hurt all the time. I can't focus, feel like I'm always walking around in a fog. I know getti[ng] disability won't make me feel better but it might make things easier.

(R. 300, 307).

Plaintiff details how her physical and mental symptoms have changed since her last Adult Function Report. Regarding her physical symptoms, Plaintiff states that she now experiences numbness in her hands and feet and pain in her arms and feet. (R. 307). She explains that, due to these symptoms, she has difficulty grasping items and picking up items. (Id.). She further explains that she now is unable to perform yard work and is able to walk only 100 feet before resting for thirty seconds. (R. 304-05). However, Plaintiff also states that, if she does "a little bit at a time," she is able to prepare her family's meals, wash her family's laundry, sweep floors and garden, assuming her pain is not too severe. (R. 301-02).

Regarding her mental symptoms, Plaintiff states that she experiences difficulty retaining information and concentrating.[7] (R. 305). Additionally, Plaintiff states that she fears other people, experiences difficulty getting along with others and prefers to stay insider her home. (R. 306). She explains that she does not get along with others because she lacks "the patience to put up with [the] stupidity of others" because she has "such high moral standards . . . of others that [she] get[s] disgusted with the things they do." (R. 305). She further explains that, when she was previously employed she felt that her "[b]osses [would] pick on [her]." (R. 306). When discussing the limitations that her mental symptoms cause, Plaintiff states that she must "shop out of town to reduce [the] chance of running into anyone [she] know[s]" and that she must be accompanied when she leaves the house if social interaction is required. (R. 303).

---

[7] To illustrate her difficulty concentrating, Plaintiff states that she "ha[sn't] been able to focus well enough to pay bills." (R. 303). However, Plaintiff further states that she lacks the funds to pay her bills. (Id.). Specifically, Plaintiff states, "I have overdrawn the checking account so many times in the past year [it's] scary. Then it takes a large portion of our funds to pay the [overdraft] fees. We have so many bill collectors calling, [it's] frustrating." (Id.).

Finally, Plaintiff describes her new daily routine. After Plaintiff awakens, she spends "a couple of hours" sitting with her feet propped up. (R. 301). She then begins housework, with which her husband and son assist. (Id.). At around 2:00 P.M., Plaintiff naps for two hours. (Id.). After her nap, she "[w]ander[s] outside for fresh air [and] to spend time with [her] dogs." (Id.). While she no longer performs pet care, she does "give [her dogs] attention." (Id.). She then prepares dinner for her family. (Id.). After dinner, she "pretty much relax[es] until [it's] time to go to bed." (Id.). At some point during the day, Plaintiff will talk on the phone with her friends and browse Facebook. (R. 304).

## IV.  THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2.	The claimant has not engaged in substantial gainful activity since October 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.	The claimant has the following severe impairments: fibromyalgia; synovial cyst in the lumbar spine, status post-surgery; sacroiliac joint dysfunction; obesity; major depressive disorder; post-traumatic stress disorder; and social phobia/generalized anxiety disorder (20 CFR 404.1520(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except that she requires a sit/stand option allowing her to change positions at 3-minute intervals. She should never crouch, crawl or climb ladders, ropes or scaffolds. She should no more than occasionally balance, stoop or climb ramps or stairs. The claimant should avoid concentrated exposure to extreme heat and cold, vibration or hazards such as dangerous moving machinery or unprotected heights. She is limited to simple, routine and repetitive instructions and tasks. She should have no contact with the public and no more than occasional interaction with co-workers and supervisors.

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.	The claimant was born on February 1, 1969 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.	Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2009, through the date of this decision (20 CFR 404.1520(g)).

(R. 21-47).

## VI.     DISCUSSION

### A.     Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ: (1) failed to accord proper weight to the opinions of Dr. Swisher, Dr. Mills and PA-C Hess and (2) improperly determined Plaintiff's RFC. (Pl.'s Br. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 6, 13, ECF No. 11). Plaintiff requests that the Court remand the case for the calculation of benefits or, alternatively, remand the case for further proceedings. (Pl.'s Mot. at 1).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that: (1) "substantial evidence supports the weight the ALJ attributed to the medical opinion evidence of record" and (2) substantial evidence supports the ALJ's RFC determination. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 6, 9, ECF No. 15). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

### B.     Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether

the ALJ's findings are supported by substantial evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Id.</u> (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

**1.  Whether the ALJ Accorded Proper Weight to the Opinions of Dr. Swisher, Dr. Mills and PA-C Hess**

Plaintiff argues that the ALJ improperly evaluated and weighed the "treating source opinions" on the record. (Pl.'s Br. at 6). Specifically, Plaintiff argues that Dr. Swisher, Dr. Mills and PA-C Hess constitute treating sources and that the ALJ "did not adhere to the factors in 20 CFR § 404.1527" when she discredited their opinions. (<u>Id.</u> at 7). Defendant argues that the ALJ properly evaluated Dr. Swisher's, Dr. Mills' and PA-C

Hess' opinions and that substantial evidence supports the weight the ALJ attributed to the opinions. (Def.'s Br. at 6).

An ALJ must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When weighing and evaluating these opinions, ALJs often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the claimant and has a treatment relationship with the claimant. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." Anderson v. Comm'r, Soc. Sec., 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, [then] it should be accorded significantly less weight." Id.

When evaluating medical opinions that are not entitled to controlling weight, the ALJ must consider the following non-exclusive list: (1) whether the physician has examined the claimant; (2) the treatment relationship between the physician and the claimant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist and (6) any other factor that tends to support or contradict the opinion. 20 C.F.R. § 404.1527 (2005). However, the ALJ need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." Fluharty v. Colvin, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015). Instead, an ALJ need only "give 'good reasons' in the decision for the weight ultimately allocated to medical source opinions." Id. (quoting 20 C.F.R. § 404.1527(d)(2)). In this regard, Social Security Ruling 96–2p provides that those

decisions "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Keeping these rules in mind, the undersigned will examine the ALJ's evaluation of Dr. Swisher's, Dr. Mills' and PA-C Hess' medical opinions.

**a. Dr. Swisher**

The ALJ accorded "little weight" to the opinion of Dr. Swisher contained in the Treating Source Statement dated May 13, 2011. (R. 29). Initially, the ALJ noted that, in the Treating Source Statement, Dr. Swisher "opined that [Plaintiff] was limited to one to two hours of activity before requiring a rest period." (Id.). The ALJ then noted that this opinion "is not consistent with the objective medical signs and findings set forth in the treatment notes." (Id.). Specifically, the ALJ reasoned that:

> Except for the reported tender points [associated with fibromyalgia], there have been no other significant physical abnormalities noted upon examination of [Plaintiff]. Her extremity range of motion has generally been normal. Therefore, . . . this opinion is not well supported by the objective medical signs and findings.

(Id.).

The undersigned finds that the ALJ properly evaluated Dr. Swisher's opinion. After determining that Dr. Swisher's opinion was not supported by the clinical evidence, the ALJ declined to accord the opinion controlling weight and proceeded to consider the five factors listed in 20 C.F.R. § 404.1527. (See R. 29). While the ALJ did not explicitly recount the details of her analysis of the five factors in her written opinion, she was not required to do so. Nevertheless, the ALJ's consideration of the factors is obvious by her

determination that Dr. Swisher's opinion was not consistent with the record (factor four). (Id.). The ALJ thus followed proper procedure when according the opinion little weight.

Plaintiff argues that "the ALJ [failed to] provide specific reasons" for her determination that Dr. Swisher's opinion was inconsistent with the record. (Pl.'s Br. at 8). The undersigned disagrees. The ALJ clearly stated that, "[e]xcept for the reported tender points, there have been no other significant physical abnormalities noted" and that Plaintiff's "extremity range of motion has generally been normal." (R. 29). While Plaintiff may wish that the ALJ had been more distinguishing, her reasoning is sufficiently specific to make clear the weight assigned to the opinion, which was all that was required of her.

Plaintiff further argues that the ALJ improperly "appears to make her own medical analysis as to what the objective findings show and mean." (Pl.'s Br. at 8-9). Plaintiff explains that "[t]he ALJ did not utilize a medical expert during the hearing" and "[t]hus, . . . simply utilized her own medical opinion to argue that Dr. Swisher's opinion was inconsistent with objective medical signs and findings." (Id.). The undersigned finds that this argument lacks merit. Contrary to Plaintiff's contention, the ALJ did not engage in any medical analysis. Instead, the ALJ merely analyzed and attempted to resolve inconsistencies in the medical evidence, which properly falls under the ALJ's role. See Lee v. Astrue, No. 3:11-CV-00958, 2012 WL 6151178, at *10 (S.D. W. Va. Dec. 11, 2012) (stating that "[w]hen there are inconsistencies in the record, the ALJ is charged with the duty of resolving the conflicts").

Finally, Plaintiff argues that the ALJ "ignored evidence that contradict[ed] her position" when she stated that Plaintiff's "extremity range of motion has generally been

48

normal." (Pl.'s Br. at 9). Specifically, Plaintiff identifies four pieces of evidence in which

Plaintiff was noted to experience: (1) restricted range of motion in her right shoulder; (2)

"some range of motion abnormalities;" (3) a range of motion in her right shoulder of

"only 110 degrees of flexion, 90 degrees of abduction [and] 20 degrees of adduction"

and (4) limited lateral movement of the cervical spine and limited range of motion of her

right shoulder. (Id.). The undersigned finds little merit in Plaintiff's argument. Even

considering the four pieces of evidence that Plaintiff identifies, a review of Plaintiff's

medical history reveals that the ALJ's statement, declaring that Plaintiff's "extremity

range of motion has *generally* been normal," is supported by substantial evidence. (R.

29) (emphasis added). In fact, Plaintiff does not argue that the ALJ's statement is

unsupported by the record but argues instead that the ALJ did not specifically address

the four pieces of evidence she identified. However, an ALJ is "not obligated to

comment on every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec.,

No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015). Instead, an ALJ

need only "provide a minimal level of analysis that enables [a] reviewing court[] to track

the ALJ's reasoning," which the ALJ supplied. McIntire v. Colvin, No. 3:13-CV-143, 2015

WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015). Consequently, the ALJ's assignment of

"little weight" to the opinion of Dr. Swisher is supported by substantial evidence.

**b.  Dr. Mills**

The ALJ accorded "little weight" to the opinion of Dr. Mills contained in the

General Physical Examination dated August 29, 2012. (R. 32). Initially, the ALJ noted

that Dr. Mills opined in the General Physical Examination that Plaintiff is "unable to work

full-time at her customary occupation or like work" and that Plaintiff "should avoid lifting,

standing or sitting for long periods [of time]." (R. 31). The ALJ then noted that Dr. Mills'

opinion is "conclusory and is not supported by the objective medical evidence of

record." (R. 32). Specifically, the ALJ reasoned that:

> [A]n opinion that the claimant is disabled or unable to do his/her past work
> is an opinion on an issue reserved for the Commissioner. . . It is notable
> that while Dr. Mills stated that there was no cure for fibromyalgia and she
> could not perform full-time work because of this impairment, she also
> stated that [Plaintiff] needed to be evaluated for disability, which would
> seem to indicate that she was unsure of [Plaintiff] were disabled. In any
> event, Dr. Mills' evaluation of [Plaintiff] does not establish objective
> medical signs and findings to support a determination that [Plaintiff] was
> disabled.

(Id.).

The undersigned finds that the ALJ properly evaluated Dr. Mills' opinion. There is

some dispute regarding whether Dr. Mills qualifies as a treating physician whose

opinion is capable of receiving controlling weight.[8] However, assuming that Dr. Mills

qualifies as a treating physician, the ALJ plainly determined that Dr. Mills' opinion was

not entitled to controlling weight because it was not supported by the clinical evidence.

(Id.). The ALJ then proceeded to consider the five factors listed in 20 C.F.R. §

404.1527. (See id.). While the ALJ did not explicitly recount the details of her analysis of

the five factors in her written opinion, her consideration of the factors is obvious by her

determination that Dr. Mills' opinion was conclusory and was not supported by the

objective medical evidence record (factors three and four). (Id.). The ALJ thus followed

proper procedure when according the opinion little weight.

Plaintiff argues that Dr. Mills' opinion was not conclusory. (Pl.'s Br. at 9-10).

Plaintiff explains that "Dr. Mills provided work-related limitations [that] remove[d] the

---

[8] Defendant argues that, because "none of Plaintiff's treatment notes are attributed to Dr. Mills[,] . . . it is questionable that Dr. Mills is Plaintiff's treating physician." (Def.'s Br. at 8).

opinion from [the] confines of an opinion on an issue reserved [for] the Commissioner."

(Id. at 9). The undersigned finds that this argument lacks merit. It is obvious from

context that the ALJ determined that only a *portion* of Dr. Mills' opinion, the portion in

which Dr. Mills states that Plaintiff is unable to perform her past relevant work, is

conclusory, not the *entire* opinion. Accordingly, the ALJ accorded little weight to this

portion of the opinion because it was conclusory and "little weight" to the rest of the

opinion because it was not supported by the objective medical evidence. Because the

Commissioner is responsible for . . . determin[ing] whether a claimant meets the

statutory definition of disability" and because "no special significance will be given to the

source of an opinion on issues reserved to the Commissioner," the ALJ did not err in

determining that a portion of Dr. Mills' opinion was conclusory and according that

portion little weight. See Nicholson v. Comm'r of Soc. Sec. Admin., 600 F. Supp. 2d

740, 754 (N.D. W. Va. 2009).

Plaintiff further argues that the ALJ erred in according little weight to the non-

conclusory portion of Dr. Mills' opinion because "the ALJ did not indicate just what

specific evidence [failed to support the] opinion." (Pl.'s Br. at 10). The undersigned

disagrees. The ALJ clearly provided her reasoning for assigning little weight to the non-

conclusory portion of Dr. Mills' opinion. (R. 32). Specifically, the ALJ reasoned that "Dr.

Mills' evaluation of [Plaintiff] does not establish objective medical signs and findings to

support a determination [of disability]," a statement which Plaintiff does not contest.

(Id.). Additionally, the ALJ reasoned that Dr. Mills' opinion was internally inconsistent.

(Id.). The ALJ explained that the opinion was internally inconsistent because, while Dr.

Mills stated that no cure for fibromyalgia exists and that Plaintiff is unable to work full-

time due to her fibromyalgia, Dr. Mills further stated that Plaintiff needed to be evaluated for disability. (Id.). The ALJ thus concluded that Dr. Mills "seemed to indicate that she was unsure if [Plaintiff] were [in fact] disabled." (Id.). While the ALJ's reasoning may be terse, it is sufficiently specific to make clear the weight assigned to the opinion, which was all she was required to provide.

Finally, Plaintiff argues that the ALJ engaged in "pure conjecture" when she stated that she was "unsure if [Plaintiff] were disabled." (Pl.'s Br. at 10). The undersigned again disagrees. An ALJ is permitted to draw reasonable inferences from the evidence of record. See McCall v. Apfel, 47 F. Supp. 2d 723, 731 (S.D. W. Va. 1999) (stating that, if juries would be permitted to draw an inference from the evidence, then "surely ALJs must be afforded the same respect"). When reviewing inferences drawn by an ALJ, a "court can do no more than require that the ALJ carefully consider the evidence, make reasonable and supportable choices and explain his conclusions." Id. While Plaintiff may disagree with the ALJ's inference that Dr. Mills seemed unsure if Plaintiff was disabled, the inference is reasonable, supported by the record and does not consist of pure conjecture or speculation. Consequently, the ALJ's assignment of "little weight" to the opinion of Dr. Mills is supported by substantial evidence.

### c. PA-C Hess

The ALJ accorded "limited weight" to the opinion of PA-C Hess contained in the Physical RFC Assessment dated September 26, 2013. (R. 37). Initially, the ALJ detailed the specific limitations that PA-C Hess opined that Plaintiff possesses. (Id.). The ALJ then noted that some of these limitations were "not fully supported by the medical signs and findings in the record" and identified which limitations she credited and which she

discredited. (Id.). When discussing the limitations that she discredited, the ALJ noted that:

> [T]here is little support for the upper extremity limitations reported by Mr. Hess. There is no evidence in the record of any problems with [Plaintiff's] hands or arms. While Mr. Hess stated that she had osteoarthritis of her hands, there are no imaging studies to document arthritis. Further, the most recent physical evaluations of [Plaintiff] have indicated that her upper extremities are perfectly normal.

(Id.).

The undersigned finds that the ALJ properly evaluated PA-C Hess' opinion. Because PA-C Hess is a physician's assistant, his opinion may not be assigned controlling weight. See SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006) (stating that "only acceptable medical sources can be considered treating sources . . . whose opinions may be entitled to controlling weight" and that "physician assistants" are not acceptable medical sources). The ALJ, therefore, properly evaluated PA-C Hess' opinion using the five factors listed in 20 C.F.R. § 404.1527. While the ALJ did not explicitly recount her analysis of these five factors, her consideration of the factors is obvious by her determination that the opinion was "not fully supported by the medical signs and findings in the record" (factors three and four). (R. 37). The ALJ thus followed proper procedure when according the opinion limited weight. While Plaintiff argues that the "ALJ does not indicate what 'limited weight' means," the ALJ clearly identified which portions of the opinion she credited and which she discredited. (Pl.'s Br. at 11).

Plaintiff contends that the "ALJ summarily argues that [Plaintiff's] most recent physical evaluations show that [Plaintiff] has no problems with her upper extremities."[9]

---

[9] In making this argument, Plaintiff notes that the "ALJ does not specifically indicate whether 'upper extremities' means arms *and* hands or just arms." (Pl.'s Br. at 12) (emphasis in original). However, the ALJ did not need to provide a definition of "upper extremity" because it is

(Id. at 12). The undersigned finds little merit in Plaintiff's argument. While the ALJ does not specifically cite to Plaintiff's most recent physical evaluations, a review of the record reveals that the ALJ's statement is supported by substantial evidence. (R. 37). Moreover, Plaintiff does not dispute the truth of the ALJ's statement. Instead, Plaintiff argues that the ALJ "[was] de facto cherry-picking . . . the record to support [her] position." (Pl.'s Br. at 12). However, as previously stated, the ALJ was "not obligated to comment on every piece of evidence presented" but was only required to "provide a minimal level of analysis that [would] enable [a] reviewing court[] to track [her] reasoning," which she supplied. Pumphrey, 2015 WL 3868354, at *3; McIntire, 2015 WL 401007, at *5.

Plaintiff also challenges the ALJ's statements that "there is little support for the upper extremity limitations reported by [PA-C] Hess" and that "[t]here is no evidence in the record of any problems with [Plaintiff's] hands or arms." (Pl.'s Br. at 11-12). Plaintiff argues that, contrary to these statements, "[t]reating source and consultative examiners all noted hand limitations," pointing to seven pieces of evidence to support her argument. (Id.). The undersigned finds that this argument lacks merit for several reasons. First, one of the pieces of evidence identified by Plaintiff is PA-C Hess' own Physical RFC Assessment, which cannot logically be used to verify its own statements. Second, the evidence identified by Plaintiff largely consists of her subjective complaints, not objective findings. (See R. 363, 413, 519). However, the ALJ found that Plaintiff's subjective complaints were "not entirely credible," a determination that Plaintiff does not contest. (R. 42). Third, the few objective findings Plaintiff identifies appear to consist of

well known that it consists of "the shoulders, arms, forearms, wrists and hands." 3 Expert Witness Checklists § 33:35 (3d ed.).

inconsequential findings. For example, Plaintiff refers to Dr. Orvik's second Disability

Determination Examination of Plaintiff, in which Dr. Orvik noted that Plaintiff "picks up

small objects reasonably well with her left hand and has some trouble with the right" and

has "upper extremity strength . . . and grip strength [of] only 4/5 on the right." (R. 413).

However, Dr. Orvik did not deem either of these findings significant enough to include in

his "summary of major complaints and gross physical findings." (See R. 414). Fourth, a

review of the record reveals that the ALJ's statements are supported by substantial

evidence. Consequently, the ALJ's assignment of "limited weight" to the opinion of PA-C

Hess is supported by substantial evidence.

### 2. Whether the ALJ Properly Determined Plaintiff's RFC

Plaintiff argues that the ALJ improperly determined Plaintiff's RFC. (Pl.'s Br. at

13). Specifically, Plaintiff argues that the ALJ failed to: (1) "indicate what evidence she

relied on in formulating the RFC;" (2) provide a narrative discussion of the evidence and

(3) explain "how or why [Plaintiff's] mental conditions limit her to simple, routine,

repetitive tasks." (Id. at 13-14). Defendant argues that the ALJ properly evaluated

Plaintiff's RFC and that substantial evidence supports the RFC determination. (Def.'s

Br. at 9).

The "ultimate responsibility for determining a claimant's RFC is reserved for the

ALJ, as the finder of fact." Farnsworth v. Astrue, 604 F. Supp. 2d 828, 857 (N.D. W. Va.

2009); see also 20 C.F.R. § 416.946 (2011). When performing an RFC assessment, an

ALJ "must first identify the [claimant's] functional limitations or restrictions and assess

his or her work-related abilities on a function-by-function basis," including the claimant's

physical abilities, mental abilities and "other work-related abilities." Williams v. Comm'r

of Soc. Sec., No. 3:14-CV-24, 2015 WL 2354563, at *4 (N.D. W. Va. May 15, 2015).

After the ALJ completes this "function-by-function analysis[,] . . . he [may] express the

RFC in terms of the exertional levels of work, sedentary, light, medium, heavy, and very

heavy." Id. The RFC "assessment must [then] include a narrative discussion describing

how the evidence supports each conclusion, citing specific medical facts (e.g.,

laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id.

Keeping these rules in mind, the undersigned will examine each of Plaintiff's arguments

in turn.

### a. The Evidence on Which the ALJ Relied

Plaintiff argues that the ALJ failed to indicate on which evidence she relied when

determining the RFC. (Pl.'s Br. at 13). Specifically, Plaintiff argues that "[t]he ALJ did not

credit the treating source opinions . . . [and] did not seem to credit the State Agency

opinions[,] . . . leaving a reviewing [c]ourt to guess as to what evidence the ALJ relied

upon in supporting her position." (Id. at 14).

The undersigned finds that the ALJ sufficiently identified the evidence on which

she relied when determining Plaintiff's RFC. At step four of the sequential evaluation

process, the ALJ determined that Plaintiff possesses the RFC to perform sedentary

work with certain limitations. (R. 25-26). To support this determination, the ALJ provided

a summary of her reasoning:

> As for the opinion evidence, the undersigned has considered the opinions
> of [Plaintiff's] treating and examining physicians, which have been
> discussed in greater detail in the body of this decision . . . . The
> undersigned has also considered the opinions of the State Agency
> medical and psychological consultants who evaluated [Plaintiff] at the
> initial and reconsideration levels of appeal . . . . While these opinions were
> reasonable at the time they were rendered, additional evidence received
> at the hearing level convinces the undersigned that [Plaintiff] is more

limited than was originally thought. The evidence now supports a finding that [Plaintiff] does have a 'severe' mental impairments, and that she should now be limited to a range of sedentary, rather than light, work.

In sum, the above [RFC] assessment is supported by the evaluations of Dr. Orvik, Mr. Morgan and Ms. Posey, and the records of the Family Medical [Clinic] of Jane Lew, Dr. Mills, WVU Healthcare, United Hospital Center, United Summit Center, Bridgeport Physical Therapy and the Shinnston Medical Center[, which were discussed in more detail in the preceding twenty pages].

(R. 46).

Plaintiff notes that the ALJ did not appear to credit the opinions of Dr. Annis and Dr. Lo, the two state agency physicians who completed the Disability Determination Explanations at the Initial and Reconsideration levels. (Pl.'s Br. at 14). Plaintiff is correct. While the ALJ failed to explicitly indicate the weight she assigned to Drs. Annis' and Lo's opinions, the ALJ clearly discredited the opinions and provided her reasoning for discrediting the opinions. Therefore, any error on the part of the ALJ in failing to explicitly indicate the weight of these two opinions was harmless in nature. See Spurlock v. Astrue, No. 3:12-CV-2062, 2013 WL 841474, at *20 (S.D. W. Va. Jan. 28, 2013) R&R adopted sub nom. Spurlock v. Asture, No. CIV.A. 3:12-2062, 2013 WL 841483 (S.D. W. Va. Mar. 6, 2013) (stating that "an ALJ's failure to explicitly state the weight he gave to a particular medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the decision and any grounds for [counting or] discounting it are reasonably articulated").[10]

---

[10] Although Plaintiff does not specifically challenge the ALJ's evaluation of Dr. Roman's opinion contained in the Mental RFC Assessment and the Psychiatric Review Technique form dated June 30, 2011, the undersigned notes that the ALJ does not specifically discuss this opinion in her written decision. However, the undersigned finds that the ALJ's failure to explicitly discuss Dr. Roman's opinion constitutes harmless error for two reasons. First, Dr. Roman's opinion is substantially consistent with the ALJ's RFC determination. Second, it is clear from the record that the ALJ's failure to explicitly discuss this opinion was inconsequential to the ultimate

Plaintiff argues that, because the ALJ appeared to only discredit evidence, a reviewing court must "guess as to what evidence the ALJ [actually] relied upon in supporting her [RFC determination]." (Pl.'s Br. at 14). The undersigned disagrees. The ALJ provided a summary of the evidence she relied upon when formulating the RFC and discussed the evidence in more detail in the twenty pages preceding the summary. (R. 26-46). Nevertheless, to be more specific, a review of the ALJ's reasoning reveals that the ALJ accorded "significant weight" to the opinions of Drs. Posey, Morgan and Orvik. (R. 39-40). While the ALJ did not explicitly indicate the weight she assigned to Dr. Orvik's opinion like she did for the opinions of Drs. Posey and Morgan, she clearly accorded the opinion significant weight and provided her reasons for doing so. (R. 29-31, 43, 46). Therefore, any error on the part of the ALJ's in failing to explicitly indicate that she accorded Dr. Orvik's opinion significant weight was harmless in nature. See Hedrick v. Colvin, No. CV 3:14-23775, 2015 WL 5003658, at *9 (S.D. W. Va. Aug. 21, 2015) (holding that an ALJ's failure to explicitly assign significant weight to several medical opinions was harmless error because "the ALJ plainly considered the opinions [and] gave them significant weight"). In addition to the opinions of Drs. Posey, Morgan and Orvik, a review of the ALJ's reasoning further reveals that the ALJ relied on portions

---

disability determination. See Bonecutter v. Astrue, No. 3:11-CV-00576, 2012 WL 4891593, at *8 (S.D. W. Va. Sept. 12, 2012) R&R adopted, No. CIV.A. 3:11-0576, 2012 WL 4895062 (S.D. W. Va. Oct. 15, 2012) (stating that, if a medical opinion is consistent with the ALJ's ultimate RFC and disability findings, then the ALJ's failure to analyze and discuss the opinion constitutes harmless error); Haddix v. Comm'r of Soc. Sec., No. 1:14CV12, 2015 WL 1212394, at *6 (N.D. W. Va. Mar. 17, 2015) (stating that failure to weigh a medical opinion is harmless error when the opinion is not relevant to the disability determination or when it is consistent with the ALJ's RFC determination); Norman v. Comm'r of Soc. Sec., No. 2:14-CV-33, 2014 WL 5365290, at *20 (N.D. W. Va. Oct. 21, 2014) (stating that, when an error is inconsequential to the ultimate disability determination, the error is harmless in nature).

of Plaintiff's testimony and several of Plaintiff's treatment records when formulating the RFC.

To be even more specific, however, the undersigned will review the RFC determination itself. The ALJ determined that Plaintiff possesses the RFC to perform sedentary work with the following limitations: (1) she requires a sit/stand option allowing her to change positions at thirty-minute intervals; (2) she should never crouch, crawl or climb ladders, ropes or scaffolds; (3) she should no more than occasionally balance, stoop or climb ramps or stairs; (4) she should avoid concentrated exposure to heat and cold, vibration or hazards such as dangerous moving machinery or unprotected heights; (5) she requires simple, routine and repetitive instructions and tasks and (6) she should have no contact with the public and no more than occasional interaction with co-workers and supervisors. (R. 25-26). Regarding Plaintiff's restriction to sedentary work and her first, second and third limitations, the ALJ stated that her decision was based on PA-C Hess' Physical RFC Assessment. (R. 37). Regarding Plaintiff's fourth limitation, the ALJ stated that her decision was based in part on Plaintiff's testimony. (Id.). Regarding Plaintiff's fifth limitation, the ALJ stated that her decision was based on Plaintiff's testimony and the opinions of Drs. Morgan and Posey. (R. 25-26). Finally, regarding Plaintiff's sixth limitation, the ALJ stated that her decision was based on Plaintiff's testimony, the opinions of Drs. Morgan and Posey and Plaintiff's treatment notes from the United Summit Center. (R. 23-24). Therefore, a review of the ALJ's decision clearly reveals the basis of the RFC determination.

Finally, Plaintiff argues that the ALJ improperly "piecemealed together an RFC by finding some of the treating source opinions credible and other parts not credible." (Pl.'s

Resp. at 2). However, it is the ALJ's duty as the finder of fact to formulate an RFC by making credibility determinations and findings of fact and by resolving conflicts in the evidence. <u>Farnsworth v. Astrue</u>, 604 F. Supp. 2d 828, 833 (N.D. W. Va. 2009); <u>see also</u> <u>Lewis v. Astrue</u>, 937 F. Supp. 2d 809, 821 (S.D. W. Va. 2013) (upholding an RFC determination in which the ALJ had rejected "the totality of each and every RFC, i.e., he selected bits and pieces and cobbled together his own RFC"); <u>Finley v. Colvin</u>, No. 3:14-CV-10126, 2015 WL 917861, at *7 (S.D. W. Va. Mar. 3, 2015) (stating that it is the duty of an ALJ to "piece[ ] together a picture of the most [the c]laimant was capable of doing despite her limitations . . . and craft[ ] an RFC finding that specifically accounted for all of the limitations supported by the evidence"). Moreover, despite Plaintiff's argument that her hand limitations were "[t]he very limitations supported in the record . . . that the ALJ did not credit and did not place in the RFC," the undersigned previously found in Part VI.C.1.c that the ALJ's decision to discredit these limitations was supported by substantial evidence. (Pl.'s Resp. at 2). Consequently, the ALJ's RFC determination is supported by substantial evidence.

### b.    A Narrative Discussion of the Evidence

Plaintiff argues that the "ALJ's RFC formulation does not provide a narrative discussion describing how the evidence supports such a conclusion." (Pl.'s Br. at 14). Instead, Plaintiff argues that the "ALJ simply provides a re-hash of the evidence over the course of the [thirty-page] Unfavorable Decision." (<u>Id.</u>). The undersigned finds that this argument lacks merit for several reasons. First, contrary to Plaintiff's claim, the ALJ did more than merely list the evidence of record. (R. 22-46). The ALJ discussed the evidence and explained which evidence she found credible and why. (<u>Id.</u>). Second, as

previously stated in Part VI.C.2.a, the ALJ's discussion of the evidence is sufficiently specific to make clear how she determined the RFC and the evidence on which she relied. In other words, the undersigned is able to discern from the ALJ's discussion of the evidence how the ALJ arrived at her conclusions regarding Plaintiff's limitations and abilities and is not left guessing at the ALJ's reasoning. Third, Plaintiff points to no authority to support her argument that the ALJ's narrative discussion of the evidence is inadequate. Consequently, the ALJ is deemed to have followed the proper legal procedures and to have provided a sufficient narrative discussion of the evidence.

### c.    The Limitation of Simple, Routine and Repetitive Tasks

Plaintiff argues that the ALJ's RFC assessment fails to account for Plaintiff's moderate concentration problems. (Pl.'s Br. at 14-15). In making this argument, Plaintiff relies on Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). (Id.). In Mascio, the Fourth Circuit held that an ALJ's boilerplate language of "simple, routine and repetitive tasks" in an RFC determination failed to account for the plaintiff's moderate difficulties in maintaining concentration, persistence or pace. Mascio, 780 F.3d at 638. However:

> [T]he Fourth Circuit was concerned that the ALJ did not explain why [the plaintiff's] moderate limitation in concentration, persistence, or pace at step three did not translate into a [specific, non-boilerplate] limitation in [the plaintiff's RFC at step four]. The Fourth Circuit noted, however, that the ALJ may find that the concentration, persistence, or pace limitation would not affect [the plaintiff's] ability to work, in which case it would have been appropriate to exclude it from the [RFC]. In Mascio, however, the ALJ gave no explanation whatsoever.

Hutton v. Colvin, No. 2:14-CV-63, 2015 WL 3757204, at *3 (N.D. W. Va. June 16, 2015).

The undersigned finds that the ALJ did not fail to account for Plaintiff's moderate concentration problems. Similar to Mascio, the ALJ found that Plaintiff possessed

"moderate difficulties" with concentration, persistent and pace at step three of the sequential evaluation process and then limited Plaintiff's RFC to "simple, routine and repetitive instructions and tasks" at step four. (R. 25-26). However, unlike in <u>Mascio</u>, the ALJ explained why Plaintiff's moderate difficulties with concentration, persistence and pace would not affect Plaintiff's ability to work. Specifically, the ALJ noted that, despite Plaintiff's difficulties, "[Plaintiff] reported that she spent a couple of hours daily on the computer, checking email, playing games, and looking at Facebook." (R. 24). The ALJ further noted that Plaintiff "enjoyed reading, taking care of her flowers and caring for her garden." (R. 24-25). The ALJ thus implicitly reasoned that, if Plaintiff was capable of performing such activities despite her difficulties with concentration, persistence and pace, then her difficulties would not affect her ability to work. (<u>See</u> <u>id.</u>). Therefore, unlike in <u>Mascio</u>, the ALJ provided sufficient reasoning for a reviewing court to conduct a meaningful review of her decision. Consequently, the ALJ's determination to limit Plaintiff's RFC to simple, routine and repetitive tasks is supported by substantial evidence.

## VII.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED,** the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections

identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 24th day of March, 2016.


ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE